UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BOBBIE LOREE TALBERT,

          Plaintiff,

   v.

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

Case No. 18-cv-05218-SI

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 10, 12

     The parties have filed cross-motions for summary judgment in this Social Security appeal. Dkt. Nos. 10, 12. Having considered the parties' papers and the administrative record, the Court GRANTS plaintiff's motion for summary judgment and DENIES defendant's motion for summary judgment. The matter is REMANDED for an immediate award of benefits.

## BACKGROUND

### I.    Administrative Proceedings

     On March 24, 2015, plaintiff Bobbie Loree Talbert filed a protective application[1] for Social Security Disability Insurance Benefits ("SSDI") under Title II of the Social Security Act. Administrative Record ("AR") at 22, 89 (Dkt. No. 9). She alleged a disability onset date of May 3,

---

[1] A protective filing date marks the time when a disability applicant makes a written statement of his or her intent to file for SSDI benefits. SSDI is available to people who have worked for employers who paid taxes to Social Security. The date SSDI eligibility ends is the "date last insured." If an applicant establishes a protective filing date before the "date last insured," the applicant will still be eligible for SSDI even if the application is completed after the date last insured. *See* 20 C.F.R. § 404.630; *see generally* 2A Jean E. Maess, Social Security: Law and Practice § 30.24 *et seq.* ("Protective Filings") (June 2019).

United States District Court
Northern District of California

2013. *Id.* at 22. Her application was denied originally and upon reconsideration. *Id.* at 89, 105. On January 27, 2017, Administrative Law Judge ("ALJ") David LaBarre held a hearing regarding plaintiff's application and heard testimony from plaintiff as well as vocational expert Jose Chaparro. *Id.* at 22, 38-74. Plaintiff was represented by counsel at the hearing before the ALJ.[2] No medical expert testified. The ALJ denied plaintiff's claims in a decision dated June 9, 2017. *Id*. at 19-31.

The Appeals Council denied review of plaintiff's claims on June 29, 2018, rendering ALJ LaBarre's denial the final decision of the Commissioner. *See id.* at 1-3. On August 24, 2018, plaintiff filed this action for judicial review pursuant to 42 U.S.C. § 405(g). Dkt No. 1. The parties have filed cross-motions for summary judgment, and plaintiff filed a reply although the Commissioner did not.

## II.    Medical and Personal History

Plaintiff was born on September 9, 1971, and she was forty-one years old on the alleged disability onset date of May 3, 2013. AR at 29. Plaintiff has at least a high school education. *Id.* Plaintiff's date last insured was December 31, 2018. *Id.* at 22. Her past employment experience included working as an administrative assistant, a payroll clerk, accounting clerk, and a data entry clerk. *Id.* at 29, 69-70.

Plaintiff applied for disability benefits on the bases of moderate to severe depression, anxiety, and bipolar disorder. *Id*. at 75, 217. Plaintiff alleged that she had been disabled as of May 3, 2013, which is the last date she engaged in substantial gainful activity. *Id.* at 24, 75.[3]

---

[2] Plaintiff has different counsel representing her in this appeal. Although the ALJ's decision states that plaintiff was represented by a non-attorney representative (Mario Davila) at the hearing, the hearing transcript states that plaintiff was represented by "James Pea, Attorney for Claimant." *Id*. at 38.

[3]  At the hearing before the ALJ, plaintiff testified that at her last job she was "taken off work" by her doctor due to stress and anxiety, and that her employer fired her while she was on leave. *Id*. at 50-53.

### A.    Mental Health Evidence

#### 1.    Dr. Krompier – Plaintiff's Treating Psychiatrist

Due to her severe anxiety and depression, plaintiff's primary care physician referred her to a psychiatrist, Dr. Andrew Krompier.  *Id*. at 221, 774.  Plaintiff began seeing Dr. Krompier in February 2014, and she saw him approximately every 3-6 weeks for treatment.  *Id*. at 221,[4] 531, 774-775, 782-790 (treatment notes dated November 4, 2015, December 15, 2015, February 26, 2016, March 4, 2016, April 8, 2016, May 6, 2016, June 13, 2016, July 18, 2016, August 23, 2016, October 10, 2016, November 28, 2016).  In a narrative report dated December 7, 2016, Dr. Krompier stated:

> Patient was told by primary care MD to see a psychiatrist after Zoloft was tried and patient felt worse.  She was then switched to Celexa.
>
> As previously submitted to Soc. Security 5/13/15 she has the following symptoms but not limited to:  mood swings, crying, hopelessness, worthlessness, severe insomnia, poor concentration, hyperphagia with [weight] gain, panic attacks, loss of interests, memory lapses, lethargy, somatic symptoms including GI distress, indecisiveness, irritableness, restlessness, fearfulness, difficulty staying organized, easily distracted, chronic procrastination, low tolerance for boredom, chronic low self esteem.  Suicide ideas but no plans.  There were hypomanic episodes note shift in mood from low to high and back to low.
>
> The diagnosis was (and is)    Bipolar II, severe, depressed
>
>                                     ADD F90.0
>
>                                     Panic F41.0
>
> First treatment was    Lamictal 25mg $\rightarrow$ 150mg $\rightarrow$ 200mg[5]
>
>                                     Wellbutrin XL 150 $\rightarrow$ 300mg
>
>                                     Ativan 0.5 Bid
>
>                                     Vistaril 50 hs  Celexa tapered
>
>                                     Counseling per other providers
>
> Visits were every 3-6 weeks for medication management

---

[4]  Plaintiff stated in a Disability Report that she first saw Dr. Krompier in January 2014, but Dr. Krompier stated in both of the sets of treatment records that he provided to the Social Security Administration that he first evaluated plaintiff on February 26, 2014.  *Id*. at 531, 774.

[5]  Dr. Krompier's handwriting is sometimes difficult to read.  In a later typewritten letter, he states the dosages of plaintiff's medications in milligrams.

Wellbutrin increased to 450mg

Abilify not tolerated

Concerta added for [illegible] 7/14 and ↑ 54 over time

Ativan was switched to Xanax .05 for panic later 1.0mg

Latuda tried 11/14 up to 60mg later up to 80mg

Ambien 10g hs for sleep added 2014 alternate [illegible]

Vistaril 50mg  Lamictal discontinued

Periods of severe insomnia as well as severe depression with crying, staying [in] bed, hopelessness, suicide thoughts.  Social interaction became impaired with isolation.  Neck pain from auto accident made depression worse.  Tried classes but intense anxiety caused her to drop out.  Later returned to complete a few classes with great difficulty.

Ritalin added in afternoon to help focus/energy

Tearfulness, hopelessness, worthlessness, persisted in follow up visits.  Feels children are her only reason to exist.

Most recent Rx          Latuda 80

                        Wellbutrin 450

                        Concerta 54 in AM Ritalin 20 in PM

                        Vistaril 50 for sleep

                        Xanax 1.0 [illegible]

Patient limited in daily activities due to low mood, anxiety, irritableness, isolation.  Medications have only been partially beneficial.  TMS[6] could help but not available.  It is my professional opinion that the patient cannot do full time competitive work.  This work disability is expected to last 12 months from now.  She is competent to handle her own funds.  Prognosis is guarded.

*Id.* at 774-776.

Dr. Krompier also completed a Mental Impairment Questionnaire that accompanied the December 7, 2016 narrative report.  *Id*. at 777-781.  Dr. Krompier's Questionnaire responses were consistent with his narrative report, and stated that plaintiff's diagnoses and limitations were expected to last at least 12 months and that she was not a malingerer.  *Id*. at 777.  In response to the

---

[6] "Transcranial magnetic stimulation (TMS) is a noninvasive procedure that uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression." https://www.mayoclinic.org/tests-procedures/transcranial-magnetic-stimulation/about/pac 20384625.

question, "Please identify the signs and symptoms that support your diagnoses and treatment," Dr. Krompier checked the following: depressed mood; persistent or generalized anxiety; feelings of guilt or worthlessness; irritability; suicidal ideation; difficulty thinking or concentrating; easy distractability; poor memory; recurrent panic attacks; anhedonia/pervasive loss of interests; decreased energy; social withdrawal or isolation; other sleep disturbances (insomnia). *Id.* at 778. When asked about which symptoms were the most frequent/severe, Dr. Krompier wrote, "very low mood (daily), worthlessness, crying spells, forgetfulness, panic anxiety, hypomanic episodes (uncommon)." *Id.* at 779. In response to a question asking, "Does your patient's psychiatric condition(s) exacerbate pain or any other physical conditions?" Dr. Krompier stated, "Auto Accident – neck/back pain makes depression/anxiety worse and the opposite." *Id*.

The questionnaire also asked Dr. Krompier, "Based on your knowledge of this patient obtained via treatment/examination, estimate your patient's ability to perform the below list of mental activities in a competitive environment on a sustained and ongoing basis (8 hours per day, 5 days a week." *Id.* at 780. Dr. Krompier stated that plaintiff had "marked" limitations in mental activities in four areas of mental functioning: "understanding and memory," "concentration and persistence," "social interactions" and "adaptation." *Id*.[7] Dr. Krompier also stated that plaintiff had "moderate-to-marked" limitations in those same four areas of mental functioning. *Id*.[8]  Dr.

_____

[7] Specifically, within the area of "understanding and memory," Dr. Krompier stated that plaintiff had a marked limitation in the mental activity of "understand[ing] and remember[ing] detailed instructions." Within the area of "concentration and persistence," Dr. Krompier noted the following marked limitations: "carry out detailed instructions"; "maintain attention and concentration for extended periods"; "perform activities within a schedule and consistently be punctual"; "sustain ordinary routine without supervision"; "work in coordination with or near others without being distracted by them"; "complete a workday without interruptions from psychological symptoms"; and "perform at a consistent pace without rest periods of unreasonable length or frequency." Within the area of "social interactions," Dr. Krompier stated plaintiff had a marked limitation in "accept[ing] instructions and respond[ing] appropriately to criticism from supervisors." Finally, within the area of "adaptation," Dr. Krompier found marked limitations in "be aware of hazards and take appropriate precautions"; "travel to unfamiliar places or use public transportation"; and "make plans independently." *Id*.

[8] Specifically, within the area of "understanding and memory," Dr. Krompier found plaintiff had moderate-to-marked limitations in the mental activities of "remember locations and work-like procedures" and "understand and remember one-to-two step instructions." In the area of "concentration and persistence," Dr. Krompier found moderate-to-marked limitations in "carry out simple, one-to-two step instructions" and "make simple work-related decisions." Within the "social interactions" area, Dr. Krompier found moderate-to-marked limitations in "interact appropriately

Krompier found that plaintiff had "none to mild" limitations in two specific areas that fell under "social interactions": "maintain socially appropriate behavior" and "adhere to basic standards of neatness." *Id*.

On August 21, 2017, Dr. Krompier submitted a letter to the Appeals Council stating that plaintiff was unable to work due to her psychiatric conditions (Bipolar II, ADD, and Panic), and that she "continues to be symptomatic as described in the previous Mental Impairment Questionnaire and narrative report." *Id*. at 37. Dr. Krompier stated that he had last seen plaintiff on August 9, 2017, and he listed her current medications (Latuda 80 mg/day; Wellbutrin 450 mg/day; Concerta 54 mg/day; Ritalin 20 mg/day; Belsomra 20 mg hs; Xanax 1 mg prn; Vistaril 50 mg hs). *Id.*

### 2. Theresa L. Phillips, Psy.D. – Consulting Clinical Psychologist

On July 2, 2015, plaintiff saw Teresa L. Phillips, Psy.D., at Bayview Medical Clinic for a consultative psychological examination. *Id*. at 534-538. Dr. Phillips noted that plaintiff was a "fair historian" and that she "presented in a cooperative manner" and "interacted appropriately with the examiner and office staff throughout the evaluation." *Id*. at 534. Dr. Phillips administered a Mini Mental State Examination ("MMSE"), which is a "brief 30-point questionnaire test that is used to screen for cognitive impairment" that is "commonly used in medicine to screen for dementia." *Id*. at 536. Based on plaintiff's performance on the MMSE, Dr. Phillips concluded that plaintiff was "in the Normal range of cognitive functioning." *Id*. at 537. Dr. Phillips also administered the Wechsler Adult Intelligence Scale, which showed that plaintiff had a full scale IQ of 98, and the Wechsler Memory Scale, which showed that plaintiff was "average" in auditory memory, visual memory, immediate memory and delayed memory. *Id*.

Dr. Phillips found that plaintiff was "moderately impaired" in "emotional" and "functional" areas, and stated that plaintiff's prognosis was "Fair with continued mental health and medical services and maintains medication compliance." *Id*. at 538. Under "Diagnostic Impressions," Dr.

---

with the public"; "ask simple questions or request assistance"; and "get along with coworkers or peers without distracting them." Finally, in "adaptation," Dr. Krompier found that plaintiff was moderately-to-markedly limited in "respond appropriately to workplace changes" and "set realistic goals." *Id*.

Phillips wrote "Adjustment Disorder with mixed anxiety and depressed mood" and Bipolar II disorder. *Id.* Dr. Phillips also concluded that plaintiff was moderately impaired in her ability to adapt to changes, hazards, or stressors in a workplace setting; mildly impaired in her ability to withstand the stress of a routine workday; mildly impaired in her ability to interact appropriately with co-workers, supervisors and the public on a regular basis; and unimpaired in other work-related abilities.[9] *Id.* Under "current level of functioning," Dr. Phillips wrote,

> The claimant reported having no physical limitations due to mental problems. She is dependent for basic ADLs on her parents. She can prepare meals. She is unable to drive.[10] She is able to make change and able to shop at the store. The claimant typically spends her day doing light household chores, visiting with friends and family, and watching TV.

*Id.* at 535.

### 3. Eden Counseling Services, Inc.

In a letter dated October 14, 2015, Veronica Macapagal, M.S., Licensed Marriage and Family Therapist provided a "treatment summary." *Id.* at 546. The letter stated that plaintiff had been treated from April 24, 2009 through July 15, 2015, for a total of 110 sessions, and that plaintiff had been treated for parenting affected by job stress, anxiety, panic episodes, financial challenges, and physical and emotional pain. *Id.*

### 4. Evaluations by State Agency Reviewing Physicians, G. Rivera-Miya, M.D. and Peter Bradley, M.D.[11]

On August 13, 2015, non-examining doctor G. Rivera-Miya, M.D., reviewed plaintiff's

---

[9] Those abilities were: ability to follow simple instructions; ability to follow complex/detailed instructions; ability to maintain adequate pace or persistence to perform one or two step simple repetitive tasks or complex tasks; ability to maintain adequate attention/concentration; and ability to adapt to changes in job routine. *Id.*

[10] Earlier in the same report, Dr. Phillips wrote, "The claimant arrived on time for the appointment today and states that she drove." *Id.* at 534. This apparent discrepancy is not explained, and elsewhere in the record there is evidence that plaintiff drives. *See, e.g.*, AR at 230 (May 12, 2015 "Function Report" completed by plaintiff stating that she drives).

[11] The ALJ refers to these doctors as a psychiatrist and a psychologist, but it is unclear from the record which is the psychiatrist versus the psychologist.

medical records and completed a Disability Determination Evaluation for plaintiff. *Id*. at 81-89. Dr. Rivera-Miya did not examine plaintiff. Dr. Rivera-Miya concluded that plaintiff had severe affective and anxiety disorders, non-severe migraines and "DDD (disorders of back – discogenic and degenerative)," and that plaintiff was not disabled. *Id*. at 81, 87. Dr. Rivera-Miya found that plaintiff had moderate restriction of activities of daily living, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace. *Id*. at 81.

Dr. Rivera-Miya stated that plaintiff's statements about her symptoms considering the total medical and non-medical evidence in the file was "partially credible" because "[t]he allegations of disability are documented in the [medical evidence of record] but the implied severity of impairment is not supported by the hx and objective findings." *Id*. at 82. Dr. Rivera-Miya did not elaborate on this statement. Dr. Rivera-Miya noted that Dr. Krompier's opinion was more restrictive and stated, "[Dr. Krompier's] opinion relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion. The opinion is without substantial support from other evidence of record, which renders it less persuasive." *Id*. at 85.

On November 25, 2015, non-examining physician Peter Bradley, Ph.D., reviewed plaintiff's case at the reconsideration level and adopted Dr. Rivera-Miya's findings. *Id*. at 101.

### B.  Evidence of Physical Impairments

Although plaintiff applied for disability benefits on the basis of mental conditions, the ALJ also considered plaintiff's physical impairments when evaluating whether she was disabled. The record contains evidence that plaintiff suffers from, *inter alia*, migraines and degenerative disc disease, causing neck and back pain and numbness/tingling in her extremities. *See generally id*. at 341-528, 547-772 (medical records from, *inter alia*, East Bay Physicians Medical Group, Eden Medical Center, Advanced Pain Management and Rehab Medical Group). The medical records state, *inter alia*, that plaintiff began experiencing neck and back pain after a January 2014 car accident. *See id*. at 346 (medical progress notes dated March 10, 2015 by Dr. Jennifer Ault, Neurologist and Pain Management Specialist); 362-364 (medical progress notes dated December 5,

2014 by Dr. Bradley Wrubel).

### C. Activities of Daily Living

Plaintiff completed a "Function Report" on May 12, 2015. *Id*. at 227-235. Plaintiff reported that her depression varied every day, and that the average was "moderate to extreme." *Id*. at 227. Plaintiff stated that there were many days when she did not get out of bed, and that she spent many days in bed reading her bible. *Id*. at 227-228. She stated that she was able to perform light housework, prepare simple meals like sandwiches, soup and cereal, and that she can drive and go the grocery store. *Id*. at 229-230. Plaintiff also stated that she is often forgetful and needed reminders for appointments and medicine and that it was "hard to remember instructions once they're given." *Id*. at 229, 232. With regard to "hobbies and interests," plaintiff listed "church, watching TV, walking @ the park," and in response to a question asking, "How often and well do you do these activities?" wrote, "Church goes well once I am there. I struggle to get there 3x's[12] a week and my faith suffers. I can and do watch TV all day/night. The noise of the TV sometimes calms me. My goal is to walk every day but I average once a week." *Id*. at 231. Under "social activities" plaintiff wrote that she spent time with others as follows: "mainly texts to family & friends. Also friends & family come to the house." *Id*.

Plaintiff's husband also completed a "Function Report" on May 12, 2015. *Id*. at 236-244. His report was consistent with plaintiff's, stating *inter alia* that "there are days she can't get out of bed" and that plaintiff spent her time watching tv, walks "if feels up to it," sleeping, and staying in bed reading the bible. *Id*. at 236-237; *see generally id*. at 236-244 (discussing plaintiff's daily life).

At the hearing before the ALJ, plaintiff testified about her activities of daily living. The ALJ asked her about a typical day. *Id*. at 53. Plaintiff testified,

> There's days where I'll, I'll get up, and I'll have a cup of coffee. And then I go to the couch. And honestly, I don't, I don't do, I don't go outside my house much. If I

---

[12] On the Function Report, plaintiff stated that she went to church twice a week "for service" and once a week to cook for the homeless. *Id*. By the time of the hearing before the ALJ, plaintiff stated that she attended church at most twice a week for Sunday services and a weekly bible study. *Id*. at 64.

need to go to the store, I can go to the store. I was sharing, I was sharing with him [her doctor] that I was at the store and I had a really bad anxiety attack and I had to leave the store and that's never happened to me before. So it kind of scared me and I just took my stuff up to the front, and I told her I'm sorry, I've got to go, you know. I just don't feel, I don't feel like I can function on a normal day-to-day, I don't know. I wish I could explain it.

*Id*. at 54. Plaintiff testified that three or four days a week she does not get out of bed and stays in bed all day, including the day before the hearing. *Id*. at 53, 59.

The ALJ questioned plaintiff about her attendance at church. *Id*. at 64. Plaintiff testified that she tries to attend a Wednesday night bible study class[13] and Sunday church services:

Q: Okay. And you go every Sunday and Wednesday, it sounds like.

A: I try. I didn't go last Sunday. I just couldn't get out of bed, so I didn't go. And I didn't go the Wednesday before. I went this Wednesday that just passed, but I didn't go the Wednesday before, and then I didn't go Sunday. I just couldn't get out of bed. I didn't want to –

*Id*. at 65. Plaintiff also testified that she finds going to church therapeutic "when I go, absolutely." *Id*. at 66. Plaintiff continued, "And that's, that's my biggest struggle, too, because I feel like if I was doing what I'm supposed to be doing and reading the Bible, and, and I had that instilled in me, then it would be okay. You know, everybody says God can heal. God can heal, and I believe that he can. He just hasn't got to me yet." *Id*.

The ALJ also questioned plaintiff about socializing and having people over at her house:

Q: And you also mentioned that you have people over. I mean, did you, how often do you have people over?

A: It's not a lot. Sometimes my kids will have one of their girlfriends, you know, or my son will have one of his friends over. Sometimes people will stop by, you know, stop by. We used to always be where everybody went, where everybody came. You know, and, and, and my husband and I fight now because I don't want anybody at my house. I don't want, you know, I don't, I just don't want to deal with anybody. I want to go home. I want to lay on my couch, and I don't want to do anything. I don't want to have to entertain somebody. I don't want to have to, for the lack of better words, be nice, be civil, be whatever. Not that I want to be mean, you know, I'm not a mean person, but I just would rather just go home and him just go somewhere. And, and me just have my space. My, that's, that's my, my four walls are my bubble.

*Id*. at 65-66.

_____

[13] Regarding the bible study class, plaintiff testified, "Honestly, I don't know why they call it a Bible study because it's, it's a service. We do like four or five songs of worship and then somebody preaches. I, I don't know why they call it Bible study, but they call it Wednesday Bible study." *Id*. at 64-65.

United States District Court
Northern District of California

**LEGAL STANDARDS**

I.      **Standard of Review**

The Social Security Act authorizes judicial review of final decisions made by the Commissioner. 42 U.S.C. § 405(g). Here, the decision of the ALJ stands as the final decision of the Commissioner because the Appeals Council declined review. 20 C.F.R. § 416.1481. The Court may enter a judgment affirming, modifying or reversing the decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g).

Factual findings of the Commissioner are conclusive if supported by substantial evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2001). The Court may set aside the Commissioner's final decision when that decision is based on legal error or where the findings of fact are not supported by substantial evidence in the record. *Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Id.* at 1098. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (internal quotation marks and citations omitted). To determine whether substantial evidence exists, the Court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Commissioner's conclusion. *Tackett*, 180 F.3d at 1098. "Where evidence is susceptible to more than one rational interpretation," the ALJ's decision should be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

II.     **Disability Benefits**

A.      **Five Step Sequential Evaluation Process**

A claimant is "disabled" under the Social Security Act if: (1) the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education,

11

and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A)-(B). The SSA regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4). The claimant has the burden of proof for steps one through four and the Commissioner has the burden of proof for step five. *Tackett*, 180 F.3d at 1098.

The five steps of the inquiry are:

> 1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).
>
> 2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).
>
> 3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).
>
> 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).
>
> 5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). The ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. *Tackett*, 180 F.3d at 1098 n.3.

In between the third and fourth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4), (e), 416.945(a)(5)(1). To determine the RFC, the ALJ considers the impact of the claimant's symptoms on his or her ability to meet the physical, mental, sensory, and other requirements of work. *Id.* §§ 404.1545(a)(4), 416.945(e). The ALJ will evaluate all the claimant's symptoms and the extent to which these symptoms are consistent with evidence in the record. *Id.* The evidence can include the claimant's own statements about his or her symptoms, but such statements must be adequately supported by the record in order to establish a disability. *Id.* In order to determine whether the claimant's statements are adequately

supported, the ALJ must first determine whether the claimant has a medical impairment that could reasonably be expected to produce his or her symptoms, and then must evaluate the intensity and persistence of the claimant's symptoms. *Id.* When evaluating intensity and persistence, the ALJ must consider all of the available evidence, including the claimant's medical history, objective medical evidence, and statements about how the claimant's symptoms affect him or her. *Id.* The ALJ cannot reject statements about the intensity and persistence of symptoms solely because no objective medical evidence substantiates the statements. *Id.* §§ 404.1529(c)(2), 416.929(c)(2). The ALJ must also consider factors relevant to the claimant's symptoms, such as the claimant's daily activities, the claimant's medications and treatment, any other measures the claimant uses to alleviate symptoms, precipitating and aggravating factors, and any other factors relevant to the claimant's limited capacity for work due to his or her symptoms. *Id.* § 416.929(c)(3)(i)-(vii). After determining the RFC, the ALJ proceeds to steps four and five of the disability inquiry.

### B.    Evaluation of Mental Disorders

The Social Security Administration has issued supplemental regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a; *see also Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721 (9th Cir. 2011):

> In step two of the disability determination, an ALJ must determine whether the claimant has a medically severe impairment or combination of impairments. In making this determination, an ALJ is bound by 20 C.F.R. § 404.1520a. That regulation requires those reviewing an application for disability to follow a special psychiatric review technique. 20 C.F.R. § 404.1520a. Specifically, the reviewer must determine whether an applicant has a medically determinable mental impairment, *id.* § 404.1520a(b), rate the degree of functional limitation for four functional areas, *id.* § 404.1520a(c), determine the severity of the mental impairment (in part based on the degree of functional limitation), *id.* § 404.1520a(c)(1), and then, if the impairment is severe, proceed to step three of the disability analysis to determine if the impairment meets or equals a specific listed mental disorder, *id.* § 404.1520a(c)(2).

*Id.* at 725.

The listings for mental disorders in adults are organized in categories, such as "depressive, bipolar and related disorders," 20 C.F.R. Pt. 404, Subpt. P., App. 1 ("Listings") § 12.00. "Paragraph A" of each listing (except intellectual disorders) includes the medical criteria for each listing. 20

C.F.R. Pt. 404, Subpt. P., App. 1 ("Listings") § 12.00(A)(2)(a). "Paragraph B" of each listing (except intellectual disorders) sets forth functional criteria used to evaluate how a mental disorder limits functioning. 20 C.F.R. Pt. 404, Subpt. P., App. 1 ("Listings") § 12.00(A)(2)(b). The Paragraph B criteria,

> [R]epresent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see §§ 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.

*Id.*

Some listings have alternative "Paragraph C" severity criteria. *See* 20 C.F.R. § 404, Subpt. P, App. 1 ("Listings") §§ 12.02, 12.03, 12.04, 12.06, 12.15. For the listings that have alternative Paragraph C criteria, a claimant must have a serious and persistent medical disorder, which is a medically documented history of the existence of the disorder over a period of at least two years, and evidence that supports the other criteria of Paragraph C of the listing. 20 C.F.R. Pt. 404, Subpt. P., App. 1 ("Listings") § 12.00(A)(2)(c).

**ALJ'S DECISION**

On June 9, 2017, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act. In determining plaintiff's disability status, the ALJ applied the five-step disability analysis in accordance with 20 C.F.R. §§ 404.1520a and 416.920(a). AR at 22-24.

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity after May 3, 2013, the alleged onset date of plaintiff's disability. *Id.* at 24.

At step two, the ALJ found that plaintiff suffered severe impairments from degenerative disk disease; bipolar disorder; and an adjustment disorder with mixed anxiety and depressed mood. *Id.*

At step three, the ALJ found that plaintiff's impairments did not meet or equal the severity

14

of any impairment in the Listing of Impairments.  With regard to Listing 1.04(A),[14] the ALJ noted that for this listing, "if there is involvement of the lower back, positive straight-leg raising test results" are required.  *Id*. at 25.  The ALJ found that "[i]mpairment consistent with these requirements is not established in the medical evidence of record," citing October 2016 treatment records showing negative straight-leg raising test results.  *Id*.

Also at step three, the ALJ found that plaintiff's impairments, considered singly and in combination, did not meet or equal the criteria of Listing 12.04 (Depressive, bipolar and related disorders) or Listing 12.06 (Anxiety and obsessive-compulsive disorders).  *Id*. at 25.  The ALJ stated,

> In making this finding, I have considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are:  understanding, remembers, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves.  A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.
>
> With respect to the first functional area, understanding, remembering or applying information, the claimant has had moderate limitation.
>
> The record refers to the claimant's history of treatment for depression and anxiety (e.g. Exhibits 3F and 8F).  Moreover, the report of a July 2015 psychological consultative examination refers to an adjustment disorder with mixed anxiety and depressed mood, as well as a bipolar II disorder (Exhibit 4F/6).
>
> At the hearing, the claimant testified that she has had significant memory loss.  In statements dated May and September 2015, her husband similarly observes that she has had memory problems (Exhibits 5E/3 and 10E/4).  Nonetheless, at the hearing, she seemed able to answer questions about her history adequately.  Likewise, the report of the July 2015 psychological consultative examination indicates that she presented with adequate memory on examination, and the examiner opines that she is able to follow detailed instructions (Exhibit 4F/4-6).  Also notable, the claimant testified that she currently attends church and  bible study group, circumstances indicative of apparently significant capability in understanding and remembering

---

[14] Listing 1.04(A) is "Disorders of the Spine," and the Listing requires "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *See* 20 C.F.R. § 404, Subpt. P, App. 1 ("Listings") § 1.04(A).

information.  In any event, she is found to have moderate limitation in understanding, remembering, or applying information.

The next functional area is interacting with others.  In this area, the claimant has had moderate limitation.  At the hearing, she testified that she rarely leaves the house and that she tends to avoid social situations.  Her husband likewise observes that she has withdrawn socially (Exhibit 10F/8).  On the other hand, as noted above, she testified that she attends church and a bible study group regularly.  Further, the consultative examination relates her allegation that she visits with friends and family (Exhibit 4F/3), and the examiner observes that she was cooperative on examination and interacted appropriately (Exhibit 4F/2).  The examiner also opines that the claimant has no more than mild limitation in interacting with other people (Exhibit 4F/6).  However, in assessments dated August and November 2015, a State Agency psychiatrist and a State Agency psychology opine that she has had moderate limitation in social functioning (Exhibits 1 A/8 and 3 A/8).  This opinion seems reasonably well-supported by the overall record and is adopted.

The third functional area is concentrating, persisting, or maintaining pace.  In this area, the claimant has moderate limitation.  At the hearing, she testified that due to her symptoms, including anxiety and depression, she often has problems in sustaining concentration, including when she tries to read.  Her husband describes her functioning in comparable terms (e.g. Exhibit 10E/4).  Nonetheless, she seemed to retain adequate concentration throughout the hearing.  Likewise, the consultative examination indicates that she retained essentially normal concentration on examination (Exhibit 4F/4), and he opines that she is able to maintain adequate attention and concentration (Exhibit 4F/7).  In their August and November 2015 evaluations, however, the State Agency psychiatrist and the State Agency psychologist opine that she has had moderate limitation in maintaining concentration, persistence in tasks, and an adequate work pace (Exhibits 1 A/8-11 and 3 A/8-12).  This opinion seems reasonably well-supported by the overall record and is thus adopted.

The fourth functional area is adapting or managing oneself.  In this area, the claimant has had mild limitation.  At the hearing, she alleged that she performs only minimal activities throughout the day.  The consultative examination relates her admission that she cooks, performs light household chores, and shops (Exhibit 4F/3).  The examiner opines that she has had restrictions as follows: no limitation in adapting to changes in a job routine; mild limitation in withstanding the stress of a routine workday; and moderate limitation in adapting to changes, hazards or stressors in a workplace (Exhibit 4F/6).  Moreover, in their August and November 2015 evaluations, the State Agency psychiatrist and the State Agency psychologist opine that the claimant has had moderate limitation in performing activities of daily living (Exhibits 1 A/8 and 3 A/8).  On the other hand, October 2016 treatment records reflect the claimant's admission that her current medications allow her to function in her activities of daily living, including self-care activities, changing clothes, taking a shower, dressing herself, cooking, cleaning, making her bed, doing laundry, and standing and walking 30 minutes at one time (Exhibit 7F/18).  In any event, in consideration of the overall record, the claimant is found to have had mild limitation in adapting and managing herself.

Additionally, in statements dated May 2015 and December 2016, the claimant's treating psychiatrist, Andrew Krompier, M.D., opines that the claimant is unable to work (Exhibits 3F/4 and 8F/4).  With respect to the adjudication of Social Security disability claims, the issue of "disability" is reserved for the Commissioner.  In his December 2016 evaluation, Dr. Krompier opines that she has had marked limitation with respect to most work-related mental functions (Exhibit 8F/8).  Nevertheless, the

medical evidence of record does not seem to document clinical signs and findings consistent with the degree of limitation assessed by Dr. Krompier. Thus, he seems to uncritically endorse her subjective complaints to a significant extent. Accordingly, Dr. Krompier's opinions are credited with little weight.

By contrast, the opinions of the consultative examiner, the State Agency psychologist, and the State Agency psychiatrist seem more consistent with the medical evidence of record. In addition, these evaluators have expertise with respect to the Social Security Administration disability program.

Because the claimant's mental impairments have not caused at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

*Id*. at 25-27.

The ALJ also concluded that the "paragraph C" criteria were not satisfied because "[t]he record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." *Id*. at 27.

Before proceeding to step four, the ALJ examined plaintiff's RFC. *Id.* at 25. The ALJ first noted that "the limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." *Id.* at 27. The ALJ stated that his assessment of plaintiff's RFC "reflects the degree of limitation I have found in the 'paragraph B' mental functional analysis." *Id.* The ALJ found that plaintiff had a moderate limitation in her ability to perform work-related mental functions, and that she had a mental residual functional capacity as follows: "able to understand, carry out, and remember simple, routine tasks; able to make only simple work-related decisions; able to perform work requiring only occasional changes to essential job functions; able to tolerate occasional interaction with the public and coworkers; and unable to work on a team or in tandem with coworkers." *Id*. at 29. The ALJ also concluded that plaintiff had a physical residual functional capacity for no more than light level exertion as defined in 20 C.F.R. 404.1567(b). *Id*. at 27-29.

Continuing to step four, the ALJ relied on testimony from the vocational expert ("VE") to find that plaintiff was unable to perform any of her past relevant work. *Id.* At step five, the ALJ also relied on testimony from the VE to find that a person with plaintiff's RFC "would be able to perform the requirements of representative occupations including the following: housekeeper/ cleaner, which the Dictionary of Occupational Titles describes as light, unskilled work . . . with

135,000 jobs in the national economy," and "routing clerk," which is also "light, unskilled work . . . with 41,000 jobs in the national economy." *Id.* at 30. The ALJ noted,

> Moreover, [Social Security Rulings] specif[y] that the basic mental demands of competitive, remunerative work include the following abilities: on a sustained basis, understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. As indicated in the residual functional capacity herein, the claimant has had the ability to perform these functions.

*Id.*

Because the ALJ found that plaintiff was able to make a "successful adjustment to other work that exists in significant numbers in the national economy," he determined that a finding of "not disabled" was appropriate. *Id.*

## DISCUSSION

Plaintiff argues that the ALJ erred in evaluating her mental impairments. Plaintiff contends that the ALJ erred in giving "little weight" to the opinion of Dr. Krompier, her treating psychiatrist, and that the ALJ failed to provide specific and legitimate reasons based on substantial evidence in the record. Plaintiff argues that because the ALJ improperly discounted Dr. Krompier's opinion, the ALJ erred in determining her mental RFC, and in applying that RFC in step five. Plaintiff requests the Court to apply the "credit as true" rule and remand the case for an immediate award of benefits.

Plaintiff also contends that the ALJ erred in evaluating her physical impairments, and that the record is devoid of any opinion from a physician assessing plaintiff's physical RFC. Plaintiff argues that the ALJ made his own determination about plaintiff's physical RFC and that his findings regarding plaintiff's physical impairments are not supported by substantial evidence. Plaintiff asserts that if the Court finds for plaintiff on this basis, the Court should remand for further proceedings including, *inter alia*, a consultative examination to determine plaintiff's physical RFC.

The Commissioner contends that substantial evidence supports all of the ALJ's findings and conclusions. The Commissioner also asserts that if the Court finds error, it should remand to the agency for further proceedings.

## I. Discredited Medical Opinion – Dr. Krompier

In this circuit, courts distinguish among the opinions of three types of physicians: (1) treating physicians who have an established relationship with the claimant; (2) examining physicians who see the claimant but do not treat her; and (3) non-examining physicians who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, the opinion of a treating physician should be given greater weight than that of an examining or non-examining physician. *Id.* Similarly, an examining physician's opinion usually should be given more weight than that of a physician who has not examined the claimant. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

For claims filed before March 27, 2017, such as plaintiff's, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). As such, the ALJ must provide clear and convincing reasons to reject the uncontradicted opinion of a treating or examining physician. *Lester*, 81 F.3d at 830. Even where an examining physician's opinion is contradicted by another physician's opinion, an ALJ may not reject the opinion without "specific and legitimate reasons that are supported by substantial evidence" in the record. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).[15]

The "substantial evidence" standard requires an ALJ to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Reddick*, 157 F.3d at 725. Conclusory statements by the ALJ are insufficient; she "must set forth her own interpretations and explain why they, rather than the doctors', are correct." *Id.* An ALJ errs if she "does not explicitly reject a medical opinion or set forth specific, legitimate reasons

---

[15] "Social Security regulations provide that, when a treating source's opinions are not given controlling weight, an ALJ must apply the factors in 20 C.F.R. § 404.1527(c)(2)(i-ii) and (c)(3-6) in determining how much weight to give each opinion." *Garrison*, 759 F.3d at 1012 n.11. "These factors are length of the treatment relationship and the frequency of examination, § 404.1527(c)(2)(i), nature and extent of the treatment relationship, § 404.1527(c)(2)(ii), "supportability," § 404.1527(c)(3), consistency, § 404.1527(c)(4), specialization, § 404.1527(c)(5), and other factors that tend to support or contradict the opinion, § 404.1527(c)(6)." *Id.*

for crediting one medical opinion over another[.]" *Garrison*, 759 F.3d at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

Plaintiff contends that the ALJ erred by assigning Dr. Krompier's opinion "little weight." Plaintiff argues that because Dr. Krompier is her treating physician, the ALJ was required to give his opinion controlling weight, and if not controlling weight, greater weight than the opinions of the consultative psychologist and non-examining State Agency physicians. Plaintiff emphasizes that Dr. Krompier had an established relationship with plaintiff, treating her beginning in February 2014 and seeing her every 3 to 6 weeks for medication management. Plaintiff argues that Dr. Krompier's opinion that she has marked limitations in all four functional areas is supported by the record, and that the ALJ did not point to specific clinical findings or evidence that undermines Dr. Krompier's opinion.

The government argues that "[t]he regulations do not direct the rote application of a weighted hierarchy for medical opinions from treating physicians, examining physicians, and non-examining physicians," and that the ALJ properly weighed the medical opinion evidence, including the opinions of the consultative examiner, Theresa Phillips Psy.D., and the state evaluating physicians, G. Rivera-Miya, M.D. and Peter Bradley, Ph.D. Cross-Mtn. at 2. The government also argues that the ALJ appropriately found that plaintiff's activities of daily living were inconsistent with the limitations found by Dr. Krompier, and that the ALJ's own observations of plaintiff at the hearing (such as his observations of her memory and concentration) supported a higher range of mental functioning than stated by Dr. Krompier.

Because Dr. Krompier was a treating physician whose opinion was contradicted[16] by the opinions of doctors Phillips, Rivera-Miya and Bradley, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence in the record" to reject his opinion. *Garrison*, 759 F.3d at 1012. The ALJ also "must set forth [his] own interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d at 725.

---

[16] The Court notes that although the physicians differed in their conclusions as to the extent of plaintiff's limitations, they all agreed that plaintiff suffers from severe mental disorders and that those disorders limit her functionality. Thus, the degree of contradiction is minimal.

Although Dr. Krompier has been plaintiff's treating physician since February 2014, the ALJ accorded his opinions "little weight." AR at 26. The ALJ cited two reasons: that, to the extent Dr. Krompier opined that plaintiff was disabled, "the issue of 'disability' is reserved for the Commissioner," and that "the medical evidence of record does not seem to document clinical signs and findings consistent with the degree of limitation assessed by Dr. Krompier. Thus, he seems to uncritically endorse her subjective complaints to a significant extent." *Id.* 27.

As to the first reason, while an ALJ is not bound by a treating physician's determination on the ultimate issue of disability, *see* 20 C.F.R. § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."), "an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014). In order to discredit Dr. Krompier's opinions, the ALJ was required to provide specific, legitimate reasons for doing so. *Garrison*, 759 F.3d at 1012.

As to the second reason, the Court finds that the ALJ's explanation for discounting Dr. Krompier's opinions is conclusory and does not meet the "specific and legitimate reasons supported by substantial evidence" standard. The ALJ did not identify what medical evidence of record did "not seem to document" clinical signs and findings consistent with the degree of limitation stated by Dr. Krompier. This is the type of conclusory statement that the Ninth Circuit has repeatedly held insufficient. *See Garrison*, 759 F.3d at 1012-13 ("In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir.1988) ("To say that medical opinions are not supported by sufficient objective findings . . . does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim."); *see also Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299 (9th Cir. 1999).

In addition, the ALJ did not address the fact that Dr. Krompier's opinions were not simply based on plaintiff's "self-reports," but also on his history of treating plaintiff every 3-6 weeks

beginning in February 2014, including medication management. The Ninth Circuit has held that "a clinical interview and a mental status evaluation . . . are objective measures and cannot be discounted as a 'self-report.'" *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017); *see also Savannah v. Astrue*, 252 F. App'x 783, 785 (9th Cir. 2007) ("Diagnosis by a medical expert constitutes objective medical evidence of an impairment."); *cf. Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998) ("Depression, diagnosed by a medical professional, is objective medical evidence of pain to the same extent as an X-ray film."). Further, although "[a] physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted," "[t]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology." *Buck*, 869 F.3d at 1049 (quoting *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 602 (9th Cir. 1999), and *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989)). The Ninth Circuit has instructed,

> Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry. Thus, the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness.

*Buck*, 869 F.3d at 1049 (citing *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987) ("However, unlike a broken arm, a mind cannot be x-rayed."); *see also Ferrando v. Comm'r of Soc. Sec. Admin*., 449 F. App'x 610, 612 (9th Cir. 2011) ("[M]ental health professionals frequently rely on the combination of their observations and the patient's reports of symptoms (as do all doctors) . . . To allow an ALJ to discredit a mental health professional's opinion solely because it is based to a significant degree on a patient's 'subjective allegations' is to allow an end-run around our rules for evaluating medical opinions for the entire category of psychological disorders."); *see also Regennitter*, 166 F.3d at 1300 (holding ALJ erred in discounting opinion of examining psychologist on the ground that psychologist "appears to have taken [the plaintiff's] statements at face value" because there was no evidence that the plaintiff was malingering or deceptive).

The ALJ also erred because he did not apply the factors set forth in 20 C.F.R. § 404.1527(c)(2)(i-ii) and (c)(3)-(6) in according Dr. Krompier's opinions "little weight." Those

regulations "provide that, when a treating source's opinions are not given controlling weight, an ALJ must apply the factors in 20 C.F.R. § 404.1527(c)(2)(i-ii) and (c)(3-6) in determining how much weight to give each opinion." *Garrison*, 759 F.3d at 1012 n.11. These factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, and specialization. An ALJ is required to analyze these factors "because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn*, 495 F.3d at 633).

The ALJ did not discuss any of these factors, and indeed they weigh in favor of giving Dr. Krompier's opinion the greatest weight. He treated plaintiff for years starting in February 2014 and saw her every 3 to 6 weeks and oversaw her medication treatment plan; he is a psychiatrist and thus a specialist in mental health disorders; and his reports about her mental health were consistent over the years, showing no improvement, and those reports were consistent with plaintiff's self-reports, the reports of her husband, and other medical providers, *see e.g.*, AR 363 (Dr. Wrubel's December 5, 2014 medical progress records noting "chronic depression"); 346, 351 (Dr. Ault's March 10, 2015 medical progress notes stating that plaintiff's pain "triggered more anxiety and depression" and that "[s]he needs ongoing psychiatric care not only to optimize her depression but to help her navigate this journey. She is really not doing well emotionally.").

Without discussing any of these factors, the ALJ gave greater weight to the opinions of the consultative psychologist Dr. Phillips, who met with plaintiff once on July 2, 2015, and the opinions of non-examining State Agency doctors (Drs. Rivera-Miya and Bradley), who did not see plaintiff and only reviewed records. The ALJ stated that their opinions "seem more consistent with the medical evidence of record" and that "these evaluators have expertise with respect to the Social Security Administration Disability Program." *Id.* at 26. However, the ALJ did not specify *how* their opinions were "more consistent with the medical evidence of record."

Significantly, Dr. Phillips, Dr. Rivera-Miya, and Dr. Bradley all agreed that plaintiff has severe mental disorders and that she had moderate impairments. See AR 538 (Dr. Phillips' report, listing plaintiff' diagnoses as "adjustment disorder with mixed anxiety and depressed mood" and

"Bipolar II disorder, and stating plaintiff is "moderately impaired" in "emotional" and "functional" areas, that prognosis is "fair with continued mental health and medical services and maintains medication compliance); AR 81-105 (State Agency assessments, stating plaintiff has "severe" "affective disorders" and "anxiety disorders" and some "moderate" functional limitations).

The Commissioner asserts that the ALJ properly determined plaintiff's mental RFC – and discounted Dr. Krompier's opinions about plaintiff's limitations – because they were inconsistent with plaintiff's activities of daily living. The Commissioner argues, "whereas Dr. Krompier attributed marked limitations due to social withdrawal or isolation, Plaintiff herself reported she visited friends and family, attended church, participated in a bible study group, and went out shopping." Cross-Mtn. at 4 (citing AR 25-26, 229-30, 535, 564). Plaintiff responds that the ALJ did not actually cite plaintiff's activities of daily living as a reason to discredit Dr. Krompier's opinions, and plaintiff argues that the government is attempting to buttress the ALJ's deficient reasoning through post hoc arguments.

Plaintiff is correct that the ALJ did not cite plaintiff's activities of daily living as a reason for discrediting Dr. Krompier's opinions. Instead, the ALJ discussed plaintiff's activities of daily living in the context of assessing plaintiff's functional areas. However, even if the ALJ relied on plaintiff's activities of daily living to discredit Dr. Krompier's opinions, the evidence of record does not support doing so. The ALJ stated, in the context of assessing plaintiff's ability to understand, remember, or apply information (and plaintiff's claimed memory loss), "Also notable, the claimant testified that she currently attends church and a bible study group, circumstances indicative of apparently significant capacity in understanding and remembering information." AR 25. However, at the hearing plaintiff testified that while she tried to attend church and bible study every week and that she found solace when she did so, it was often difficult for her attend because of her depression and anxiety, and that she often had a difficult time getting out of bed. *Id*. at 65-66. Plaintiff also testified that the "bible study" was more of a service in which the worshippers would sing four or five songs and someone would preach. *Id*. at 64-65. Plaintiff's testimony does not provide support for the ALJ's statement that her attendance at church and bible study were "indicative of apparently significant capacity in understanding and remembering information."

United States District Court
Northern District of California

The ALJ also noted plaintiff's "regular" attendance at church and bible study in the context of analyzing her ability to interact with others. *Id*. at 25. However, as noted *supra*, plaintiff did not testify that she attended church and bible study regularly; to the contrary, she testified that she tried to go every week, and that sometimes she was unable to because of her mental health struggles. The ALJ also noted, when analyzing plaintiff's ability to interact with others, that "the consultative examination relates her allegation that she visits with friends and family." *Id*.; *see also id*. at 535 (consultative examination report, stating "The claimant typically spends her day doing light household chores, visiting with family and friends, and watching TV."). While the consultative examination report included that statement without providing details on the frequency or nature of those visits, the consultative report also stated, "She is dependent for basic ADL's on her parents." *Id*. Further, the ALJ omitted any discussion of plaintiff's testimony at the hearing – provided in response to the ALJ's question asking, "how often do you have people over?" – in which plaintiff stated, "It's not a lot. Sometimes my kids will have one of their girlfriends, you know, or my son will have one of his friends over . . . . I just don't want to deal with anybody. I want to go home. I want to lay on the couch, and I don't want to do anything. I don't want to have to entertain somebody." *Id*. at 65.[17]

Further, the Ninth Circuit has held that a claimant's activities of grocery shopping, watching TV and attending church are "not consistent with regularly attending a full-time job." *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017) (holding ALJ erred in discrediting psychologist's

___

[17] It is not clear from the ALJ's decision whether he implicitly found plaintiff to be lacking credibility, or partially lacking credibility. The ALJ did discount Dr. Krompier's opinion on the ground that "he seems to uncritically endorse her subjective complaints to a significant degree," and the ALJ repeatedly contrasted plaintiff's testimony about her limitations with what he viewed as contrary evidence, such as the cherry-picked statements discussed *supra* about her activities of daily living. *See* AR 25-26. However, "[o]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" *Id*. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id*.; *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability."). Here, the ALJ did not find that plaintiff was malingering and he did not provide any reasons for finding plaintiff not credible.

opinion that a claimant likely would not maintain regular attendance at work based on activities because "the ALJ provided no explanation as to why Popa's ability to attend church weekly in the past, shop for groceries, and watch television, establish that Popa possesses the ability to maintain regular attendance at work.").  As the Ninth Circuit has explained:

> The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, *see, e.g., Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir.1986) (claim of pain-induced disability not gainsaid by capacity to engage in periodic restricted travel); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (ordering award of benefits for constant back and leg pain despite claimant's ability to cook meals and wash dishes), and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication.

*Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  The ALJ's reliance on plaintiff's activities of daily living are not a specific and legitimate reason to discount the opinion of Dr. Krompier.

The Commissioner also asserts that "the ALJ's own observations of Plaintiff supported the minimal range of functioning delineated in Plaintiff's RFC," and the Commissioner argues that although Dr. Krompier opined that plaintiff had marked limitations in a number of work-related mental functions, "at the January 27, 2017 merits hearing, the ALJ had the opportunity to personally examine Plaintiff and noted that Plaintiff appeared to retain adequate concentration throughout the hearing and seemed able to answer questions about her history accurately."  Cross-Mtn. at 4 (citing AR 25-26).  In his decision, the ALJ stated that plaintiff "testified that she has had significant memory loss" and that "[i]n statements dated May and September 2015, her husband similarly observes that she has had memory problems," but "[n]onetheless, at the hearing, she seemed able to answer questions about her history adequately."  AR 25.  Similarly, the ALJ noted that plaintiff testified "that due to her symptoms, including anxiety and depression, she often has problems in sustaining concentration, including when she tries to read" and that "[h]er husband describes her functioning in similar terms."  *Id*. at 26.  The ALJ continued, "[n]onetheless, she seemed to retain adequate concentration throughout the hearing."  *Id*.

Plaintiff notes that, as with plaintiff's activities of daily living, the ALJ did not cite his own observations of plaintiff as a reason to discredit Dr. Krompier.  Moreover, plaintiff notes that courts have held that it is improper for an ALJ to rely on his or her own observations as a basis for

discrediting medical evidence and denying benefits.

The Court finds that to the extent the Commissioner seeks to justify the ALJ's discounting of Dr. Krompier's opinion on the basis of the ALJ's own observations of plaintiff at the hearing, that argument lacks merit. In *Perminter v. Heckler*, 765 F.2d 870 (9th Cir. 1985), the Ninth Circuit held that an ALJ should not deny a claimant benefits based on the ALJ's observations of the claimant at the hearing, as long as the claimant's statements were objectively supported. "The ALJ's reliance on his personal observations of [plaintiff] at the hearing has been condemned as 'sit and squirm' jurisprudence." *See id.* at 872 ("Denial of benefits cannot be based on the ALJ's observation of [plaintiff], when [plaintiff's] statements to the contrary, as here, are supported by objective evidence."); *cf. also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) ("[t]he ALJ's observations of a claimant's functioning may not form the sole basis for discrediting a person's testimony.").

Accordingly, the Court concludes that the ALJ erred by giving "little weight" to Dr. Krompier's opinion. The ALJ failed to provide any specific legitimate reason based on the substantial evidence in the record to discredit Dr. Krompier's opinion, including his assessment of her functional capabilities. Because the Court agrees with plaintiff's contentions regarding her mental impairments, the Court does not address plaintiff's arguments about the ALJ's analysis of her physical impairments.

### III. Residual Functional Capacity Finding and Step Five

Plaintiff argues that the ALJ erred with respect to the RFC finding and at step five of the five-step analysis.[18] Plaintiff argues that the ALJ's RFC did not include plaintiff's mental functional limitations, and that the ALJ improperly relied upon part of the VE testimony based on an incomplete hypothetical presented by the ALJ.

---

[18] Once the plaintiff establishes that she suffers from a severe impairment that prevents her from doing past work, the burden shifts to the Commissioner at step five to demonstrate that the plaintiff "can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010). The Commissioner can meet this burden "in one of two ways: '(a) by the testimony of a vocational expert, or (b) by reference to the Medical–Vocational Guidelines[.]'" *Id.* (citation omitted).

At the hearing, the ALJ posed the following hypothetical individual to the VE: "a hypothetical individual of the claimant's age and education, and with the past jobs that you described. Further assume that this individual is limited to, or rather is able to perform at all exertional levels. The individual was able to understand, carry out, and remember simple, routine tasks involving only simple work-related decisions with the ability to adapt to routine, workplace changes. The individual could tolerate frequent interaction with the public." AR 70. The VE testified that such a person could not perform any of plaintiff's past work. *Id.* The ALJ then asked if that same hypothetical individual could perform any other work in the national economy. The VE testified that this hypothetical individual could do the work of "housekeeping, cleaner" and "routing clerk." *Id.* at 70-71. The ALJ relied on this part of the VE's testimony at step five to conclude that plaintiff is not disabled.[19]

Plaintiff argues the VE's testimony in response to the ALJ's hypothetical is unreliable. The Court agrees. "In order for the testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002). "If the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value." *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001). Hypothetical questions posed to a vocational expert must include a claimant's subjective impairments unless the ALJ has clear and convincing reasons for discrediting the claimant's testimony. *See Gallant*, 753 F.2d at 1456; *see also Thomas*, 278 F.3d at 959.

Here, Dr. Krompier found a number of limitations that were not accounted for in the ALJ's RFC finding. Dr. Krompier found that plaintiff had marked limitations in all four areas of mental functioning, including numerous marked limitations within the area of concentration and persistence and adaptation. AR 780. Dr. Krompier stated that plaintiff's medications had only been "partially beneficially," and that "as a result of plaintiff's multiple psychiatric conditions, she would be

---

[19] As discussed *infra*, the ALJ and plaintiff's counsel later posed additional hypotheticals to the VE that did incorporate plaintiff's limitations, and in response to those hypotheticals, the VE testified that such a person would not be able to work. AR 72-73.

impaired following simple work instructions, complex work instructions, normal work pace and safety, getting along with work peers, supervisors and the public. Her impairments would be to a severe degree due to mood swings, panic, crying, poor concentration, irritableness." *Id*. at 532. The errors the ALJ made in according Dr. Krompier's opinion "little weight" and improperly relying on plaintiff's activities of daily living and his own observations of plaintiff necessarily led to error at the RFC stage and at step five of the disability evaluation.

## IV.    Remedy

The remaining question is whether to remand for further administrative proceedings or for the immediate payment of benefits under the credit-as-true doctrine. "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). However, under the credit-as-true rule, the Court may order an immediate award of benefits if three conditions are met. First, the Court asks, "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id.* (quoting *Garrison*, 759 F.3d at 1020). Second, the Court must "determine whether there are outstanding issues that must be resolved before a disability determination can be made, . . . and whether further administrative proceedings would be useful." *Id.* (citations and internal quotation marks omitted). Third, the Court then "credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id.* (citing *Treichler*, 775 F.3d at 1101). Even when all three criteria are met, whether to make a direct award of benefits or remand for further proceedings is within the district court's discretion. *Id.* (citing *Treichler*, 775 F.3d at 1101). In rare instances, all three credit-as-true factors may be met but the record as a whole still leaves doubts as to whether the claimant is actually disabled. *Trevizo*, 871 F.3d at 683 n.11. In such instances, remand for further development of the record is warranted. *Id.*

Here, the Court has already found that the ALJ failed to provide legally sufficient reasons for rejecting the medical opinion of Dr. Krompier and for relying on plaintiff's activities of daily

living and his own observations of plaintiff. The Court further finds that there are no outstanding issues to resolve and that further administrative proceedings would not be useful. The medical record in this case is extensive, and shows that as early as 2009, plaintiff began receiving psychological treatment for her mental conditions, and that she has been under the regular care of a psychiatrist since February 2014. The medical evidence shows that plaintiff has been compliant with treatment, including trying and taking numerous psychiatric medications, and that the medications have been only "partially beneficial." Dr. Krompier has repeatedly opined that plaintiff is unable to work in a full-time competitive environment. Further, as noted *supra*, Dr. Phillips, Dr. Rivera-Miya, and Dr. Bradley all agreed that plaintiff has mental disorders and that she had moderate impairments. See AR at 538 (Dr. Phillips' report, listing plaintiff' diagnoses as "adjustment disorder with mixed anxiety and depressed mood" and "Bipolar II disorder, and stating plaintiff is "moderately impaired" in "emotional" and "functional" areas, that prognosis is "fair with continued mental health and medical services and maintains medication compliance); *id.* at 81-105 (State Agency assessments, stating plaintiff has "severe" "affective disorders" and "anxiety disorders" and some "moderate" functional limitations). Although the Commissioner asserts that remand for further proceedings is the appropriate remedy in the event the Court concludes the ALJ erred, the Commissioner does not state what further proceedings would be necessary on remand.

Crediting the discredited testimony as true, there is no doubt as to plaintiff's disability. The Ninth Circuit has consistently remanded for an award of benefits in cases where a VE was posed a hypothetical that included the RFC that a claimant would possess if improperly discredited opinions or testimony were taken as true. *See, e.g.*, *Garrison*, 759 F.3d at 1022; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988). In those cases the claimant's counsel presented an alternative hypothetical to the VE that included the claimant's limitations and RFC as described by medical opinion or the claimant's testimony. In each case the VE responded to that hypothetical by saying that a person with those limitations would be disabled. And in each case, the Court found that based on that evidence, the ALJ would be required to find the claimant disabled on remand if the improperly rejected evidence were credited as true.

1    Here, both the ALJ and plaintiff's counsel posed hypothetical questions to the VE that

2    reflected plaintiff's testimony and the opinion of Dr. Krompier as to plaintiff's RFC.  Specifically,

3    the ALJ asked whether there would be jobs in the national economy for someone of plaintiff's "age,

4    education, and work experience, who is able to perform at all exertional levels.  The individual is

5    able to understand, carry out, and remember simple, routine tasks involving only simple work-

6    related decisions with only occasional changes to the essential job functions.  The individual could,

7    the individual could tolerate occasional interaction with the public.  The individual can occasionally

8    interact with coworkers but cannot work on a team or in tandem with coworkers.  The individual

9    be, would be off-task approximately 10% of the workday due to poor concentration and anxiety."

10   AR at 72.  The VE responded that that there were no jobs available for this person.  *Id.* at 73.

11   Plaintiff's attorney also asked "if you had a hypothetical individual, again the same age and profile

12   of this claimant, no exertional limitations, but would potentially miss work on a consistent basis

13   about one day per month.  How would that affect the past work and other work?"  *Id.* at 73.  The

14   VE responded, "That would eliminate the past work.  It would also eliminate all other work."  *Id.*

15   The VE's testimony provides adequate basis for the Court to conclude that plaintiff is disabled

16   without remanding for further proceedings to re-determine her RFC.  *See Garrison*, 759 F.3d at

17   1022.

18   Nor does the record as a whole leave "serious doubt that [plaintiff] is, in fact, disabled."  *See*

19   *id.* at 1021.  The record shows that plaintiff's mental conditions would cause serious interference

20   with her ability to maintain a normal work routine.  The Court sees no basis for serious doubt in the

21   record that plaintiff is disabled.  Moreover, remand for benefits is appropriate here where plaintiff

22   first applied for benefits over five years ago and has already experienced lengthy, burdensome

23   litigation.  *See Vertigan v. Halter*, 260 F.3d 1044, 1053 (9th Cir. 2001).

24

25

26

27

28   ///

## CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiff's motion for summary judgment, DENIES defendant's motion for summary judgment, and REMANDS for an immediate award of benefits.

**IT IS SO ORDERED**.

Dated: March 16, 2020

_____
SUSAN ILLSTON
United States District Judge